2012 OK CIV APP 86

**In the Matter of T.J.; R.D.; R.D. and T.D., Deprived Children.**

**Ladine Jeremiah, Appellant,**

**v.**

**State Of Oklahoma, Appellee.**

**No. 110,016.**

Court of Civil Appeals of Oklahoma, Division No. 3.

Aug. 27, 2012.

Kristie D. Scivally, Oklahoma City, Oklahoma, for Appellant.

Valier Baker, Assistant District Attorney, Oklahoma City, Oklahoma, for Appellee.

Rene Gish, Public Defenders Office, Oklahoma City, Oklahoma, for Minor Children.

WM. C. HETHERINGTON, JR., Judge.

¶ 1 Appellant Ladine Jeremiah (Mother) appeals an order terminating her parental rights to her minor children, T.J., R.D., R.D., and T.D., based upon unanimous jury verdicts each of which found Mother "failed to correct the conditions that led to the finding that a child is deprived pursuant to 10A O.S. § 1–4–904(B)(5)." We **REVERSE** and **REMAND** the order.

*FACTS*

¶ 2 In 1997, Mother quit high school to give birth to T.J., without marrying his biological father. She subsequently married Mr. Davis, and during their marriage three children were born, R.D., R.D., and T.D. After a single domestic violence incident in 2006, Mother and Mr. Davis separated but never dissolved their marriage.

¶ 3 On March 9, 2008, Mother had a fight at her home with her ex-boyfriend,[1] during which the three oldest children, ages 11, 7½, and 6½, were playing at a neighbor's house and T.D., almost 3 years old, was napping on the sofa. After the ex-boyfriend left, he reported the incident to the police. The children were home eating supper when the police arrived at her house. After hearing both sides, the police arrested Mother and the ex-boyfriend. Mr. Davis heard about Mother's arrest and drove to her house to get the children, but was instead arrested for an outstanding warrant issued for the 2006

domestic violence charge. The children were taken into custody, and after a hearing, the trial court granted emergency custody to Oklahoma Department of Human Services (DHS).

¶ 4 On March 17, 2008, the Oklahoma County District Attorney, on behalf of the State of Oklahoma (State), filed a petition to adjudicate the children as deprived against Mother, Mr. Davis and the putative father of T.J. The allegations against Mother were (1) domestic violence in the presence of the children for which she was charged and incarcerated in Oklahoma County Jail, (2) prior domestic abuse with the father of three of the children, (3) inadequate home due to no running water, (4) currently unemployed and unable to provide for her children, (5) use of inappropriate discipline, *i.e.,* "whoops the children with a belt, hits them with her hand and pinches their arms," and (6) in need of anger management. Mother was still in jail when served the petition to adjudicate and summons March 19, 2008.

¶ 5 On March 26, 2008, Mother completed a pauper's affidavit, stating she was unemployed, receiving food stamps, living in Section 8 housing, and would no longer be receiving any financial assistance from her ex-boyfriend. The same day the trial court found Mother was indigent, and due to a conflict of interest with the Public Defender's office, appointed counsel to represent her.

¶ 6 On April 10, 2008, a "Summary of Facts/Stipulation to Deprived Adjudication" was filed which Mother and Mr. Davis, their counsel, State and the trial judge signed. The trial court's form Journal Entry, filed the same day, indicated by checkmarks the appearance of both parents and their counsel and that reasonable efforts had been made to prevent removal of the children. At the bottom of the same order, the trial court added, in pertinent part, "Mother and Father

---

1. It is undisputed on this record that Mother was packing to move to Mississippi to live with her Father, when her ex-boyfriend arrived there, they got into a verbal argument about her leaving, he hit her, and she reacted by kicking him. He received scratches to his arm and elbow when he

fell against her front door. She called police, and admitted at trial the mistake she made was taking it upon herself to make him quit calling her names and squealing his tires, by taking a baseball bat to the side mirror of his vehicle.

are stipulating." [2]

¶ 7 On April 22, 2008, DHS filed an "Individualized Service Plan (ISP) Dispositional Report," signed by Mother and Mr. Davis. The trial court's Disposition Journal Entry was also filed, indicating adoption of the ISP "as an order of the court as is."

¶ 8 The ISP identified the following "Conditions that need to be corrected":

[Mother] and Mr. Davis need to provide a home for their children that is safe and free of domestic violence. [Mother] and Mr. Davis need to complete domestic abuse counseling to prevent future incidents of violence, including yelling or hitting during arguments. [Mother] and Mr. Davis need to ensure [the four children] are not harmed while in [Mother's] care.

Mother was instructed to attend and complete domestic violence classes at the YWCA [3] and parenting classes with another provider, and prior to reunification, she was required to permit home based services. She was also required to visit her children as ordered by the court, sign releases to persons or agencies providing services to her, maintain contact with caseworker, attend, participate, and complete the requirements of all plan services, and attend permanency hearings and permanency planning reviews.

¶ 9 Two days later, the trial court filed a Child Support Order, which indicated Mother's appearance, *without* counsel. "Being informed by evidence presented and hearing from the parties and *counsel*," the trial court found it had jurisdiction and ordered Mother to pay $345.50/month in child support beginning September 1, 2008, which obligation was "set in accordance to the guidelines without deviation." [4]

¶ 10 Mother, who was still unemployed but DHS reported as "actively looking," quickly completed her parenting class, but was delayed starting the domestic violence class at the YWCA until December 2008. The record reveals the delay resulted from the YWCA's first assessment indicating Mother did not need any services, and DHS's requirement for reassessment.[5] On January 9, 2009, Mother pleaded guilty and was sentenced in her criminal misdemeanor case, part of which included a 52–week Batterer's Intervention Program with STAT Court Services ("the STAT class").

¶ 11 Although Mother had just started the STAT class in February, DHS recommended termination of Mother's parental rights in its March 9, 2009 ISP progress report, because she had lost her Section 8 housing due to nonpayment of her gas bill.[6] The trial court approved its request, and State filed a termination petition against Mother on March 25, 2009, alleging that she failed to correct the conditions which led to the deprived adjudication, 10 O.S. Supp. § 7006–1.1(A)(5). In June 2009, DHS withdrew its recommendation to terminate, reported Mother had completed 10 out of 11 STAT classes, and requested a trial reunification with Mother "once an apartment is obtained and inspected."

¶ 12 In July 2009, DHS again recommended termination of Mother's parental rights because she had yet to obtain a home

---

2. The trial judge's handwritten notes further state, "Mother no amendeds. Father amends." Whether the trial court is referring to the Stipulation's reference to both a "Petition" and an "Amended Petition" is not clear from the record. See fn 20 for further explanation.

3. Mother's "To-do" for "Domestic Violence–Adult," required she 1) "contact a service provider recommended by DHS"; 2) "attend an intake through the YWCA and participate and complete all recommended classes and all home work that maybe (sic) assigned"; 3) "provide worker with certificate for completion upon completing the program"; and 4) "not be involved in any domestic violence incident reports throughout this case."

4. Per the judge-signed child support computation sheet attached to the order, the parents' gross monthly income was set $1,014.00 each.

5. The YWCA's reassessment found its services "would be beneficial."

6. The specific recommendation for termination was "due to failure to correct the conditions that led to the children's removal ... domestic violence and *also inadequate or dangerous shelter. Neither parent is able to provide adequate shelter.*" We note for the record that prior to this recommendation DHS had directed her to community resources for assistance and paid one of her utility bills.

with working utilities and had missed 3 weeks of the STAT class.[7] DHS subsequently gave Mother another chance upon learning, *inter alia,* she had restarted her STAT class and was pursuing a GED.

¶ 13 Mr. Davis' parental rights to the three youngest children were terminated in February of 2010. On March 12, 2010, State amended its petition, seeking to terminate Mother's parental rights pursuant to "10A O.S. § 1–9–904(A) and (B)(5)" for "failure to correct the conditions." The next month, the trial court gave Mother a final warning to start complying.[8] Over the next year, Mother continued to work on her GED and learning computer skills, and the foster parents of her children helped with temporary housing, making a resume, and transportation.[9] Due to struggles with her finances, Mother stopped attending the STAT class, and State filed a motion to revoke her suspended sentence.[10] The revocation hearing was continued for several months,[11] and by September 2010, DHS reported it had not been able to verify Mother's reports that she had been approved for Section 8 housing, restarted her STAT class, and obtained employment at a motel, because she was not keeping regular contact with the caseworker. Its request for a termination trial in January 2010 was based on her "failure to correct the conditions which brought the children into care," including refusing to maintain contact with her worker and a stable job to support her children.

¶ 14 A newly assigned judge presided over the termination trial held April 6–7, 2011. State presented two witnesses in its case-in-chief, the DHS caseworker and Mother, and admitted 6 exhibits. The children's attorney and Mother's attorney cross-examined each witness, and the children's attorney admitted an exhibit when questioning the caseworker. After State rested, the children's attorney announced it had no other evidence and also rested. Mother demurred to the evidence, arguing "there's not sufficient evidence to terminate parental rights" and moved "for a directed verdict to the contrary." The trial court overruled Mother's demurrer and denied her directed verdict motion. Mother announced she had no witnesses to present and rested.

¶ 15 The jury returned four unanimous verdicts, one for each child, stating:

> *the time she paid child support* there was not enough money left to even be working, her $125 rent payment was due the 15th with another $125 due on the 30th, but she did not have the money nor a way to get the money. During this period, DHS caseworker offered to drive Mother around to pass out her resume and filed paperwork to assist Mother's application for Section 8 housing to move her to the top of the list.

7. In the July 2009 ISP Progress report, the caseworker explains Mother's reasons for missing:

   [Mother] continues to be employed but has not been able to obtain housing. [Mother] states that [DHS] *is taking so much from her for child support, that she is unable to obtain housing.* [Mother] has also missed three weeks of her domestic violence classes as reported by STAT. [Mother] also *reports that this is due to her not having enough money to pay for her classes.* (Emphasis added.)

8. The trial court found, in its order filed April 19, 2010, that "Mother realizes that if she doesn't comply, this will be the nail in the coffin of her case. She must show GED, stability, housing and employment and be in compliance with her probation in the criminal case."

9. The caseworker reported in her April 15, 2010 report that a lot of people were helping Mother "but to no avail" because "she had quit a full-time job at Sonic to work part time nights at KFC to try to get her GED, and KFC had cut her hours." She also reported 1) the "foster parents [are] unwilling to support DHS with terminating Mother's parental rights—although given sufficient time, she has not had necessary support to help her be successful in correcting those conditions"; and 2) Mother's statements to her that *by*

10. In the DHS June 2010 report, the caseworker noted Mother had an apartment, new employment, and was attending GED classes, but still recommended termination, stating DHS "has given all the support possible to help [Mother] correct her situation." When asked about the STAT classes, "[Mother] became very upset stating she couldn't go because she did not have the money because she had to pay child support as well as court costs and attorney fees." The caseworker then gave her opinion that "Mother continues not to take responsibility for quitting jobs" and "continues to believe that she could take care of all these things if the children were in the home and she did not have to pay child support."

11. There is no further mention of a revocation hearing in the record, and based on the testimony in the transcript it had not yet been held by the time of trial.

We, the jury, empaneled and sworn in the above entitled cause, do upon our oath, find by clear and convincing evidence that the parental rights of the parent, LADINE JEREMIAH, to the child, [child's initials], **SHOULD BE TERMINATED** on the statutory ground of:

Failure to correct the conditions that led to the finding that a child is deprived pursuant to 10A O.S. 1–9–904(B)(5).

(Bold in original.) Based on each of the jury's verdicts, the trial court filed its journal entry of judgment, which ordered termination of Mother's parental rights to her four children who would remain wards of the court.

¶ 16 The termination order, approved as to form by counsel for State, the children and Mother, was filed August 4, 2011. Mother filed an appeal from that order October 24, 2011, alleging she did not receive notice of the filing of the termination order until September 23, 2011. By order filed October 24, 2011, the Supreme Court found Mother's petition in error "appears to be timely" and allowed it to proceed.

## ANALYSIS

### Appellate arguments

¶ 17 Under two propositions of error, Mother argues the record lacks clear and convincing evidence to support she had failed to correct the conditions which led to the deprived adjudication and that termination is in the best interests for her children. Her first proposition does not simply challenge the lack of any evidence of domestic violence in her life after the adjudication. Mother also asserts State's contention she failed to correct that condition is based on her failure to complete the STAT class ordered in her criminal misdemeanor case. She argues failure to complete that class "cannot be relied upon" because it was never ordered or approved as part of her ISP. Having completed her parenting class and 30 weeks of the STAT class, she contends she substantially complied with her ISP *and* corrected the condition.

¶ 18 Because the latter part of Mother's argument questions the judicial approval and/or notice of the STAT class, we address this issue first. Although raised for the first time on appeal, "[w]e may review claims which relate to alleged deprivations of due process of law despite a failure to preserve error." *Patterson v. Beall,* 2000 OK 92, ¶ 1, 19 P.3d 839, 841; *Manufacturers Guild, Inc. v. City of Enid,* 2010 OK CIV APP 87, ¶ 11, 239 P.3d 986, 989. "In passing upon a claim that the procedure used in a proceeding to terminate parental rights resulted in a denial of procedural due process, we review the issue *de novo.*" *Matter of A.M. & R.W.,* 2000 OK 82, ¶ 6, 13 P.3d 484, 487. "*De novo* review requires an independent, non-deferential re-examination of another tribunal's legal rulings." *Id.*

¶ 19 Because "parents have a constitutionally protected liberty interest in the continuity of the legal bond with their children," our courts require that "the full panoply of procedural safeguards" be applied when State seeks to terminate parental rights. *A.M. & R.W.,* 2000 OK 82, ¶ 8, 13 P.3d at 487. Due process requires notice which reasonably informs a parent such interest may be adversely affected. *Id.* State must also provide the parents with fundamentally fair procedures. *Id.* Appellate courts will determine on a case-by-case basis whether a parent was afforded such safeguards because the due process clause does not by itself mandate any particular form of procedure. *Id.,* ¶ 9, 13 P.3d at 487.

¶ 20 Concerning Mother's ISP, the jury in this case heard her caseworker testify that "domestic violence/anger management" was "the condition" identified in her "limited treatment plan" for which Mother was given two basic requirements-complete domestic violence and parenting classes. She explained Mother's ISP was "limited" because "[she] appeared to be a good mom, to take good care of her kids. The teacher and staff at school said they were always clean, really well-groomed, their hair done, that kind of thing. They were always at school on time." [12]

12. The April 9, 2008 DHS Family Group Deci-  sion Making report includes the foster parent's

¶ 21 Further, in response to the question whether there had ever been any modifications to Mother's court-approved treatment plan, the caseworker said, "No." She gave the same response to the next question, "Do you recall any request for any modifications?" The caseworker then testified:

The only thing that is *not real specific* in [Mother's plan], we talk about a domestic violence class for her to take. And we ended up—because she was required by the Court in the criminal matter to go through domestic violence, their classes, those were acceptable to us and we didn't see the need in making her do double duty. *And so while ours lists going to the Y for classes and/or anger management, we accepted the fact that she was going to those other classes, and that was never specifically marked out and said, you know, STAT classes instead of that.* But it's the same domestic violence classes services, so it was the same thing. (Emphasis added.)

Although it was an admirable gesture to prevent Mother from double duty of a class undoubtedly dealing with the *same subject*, it fails to consider the caseworker's testimony 1) the domestic violence class at the YWCA would take only 16–20 weeks to complete, and 2) the STAT class through the criminal case was "essentially *plugged in* for this [deprived child] case."

¶ 22 The caseworker did not give any specifics regarding when this "plugging in" decision occurred, who made that decision, or whether it was ever communicated to the court, Mother, or her counsel. According to the record, Mother plead guilty January 9, 2009 to the misdemeanor charges of domestic violence and molesting a standing vehicle, and as part of her sentence, the court in her criminal case ordered her to take the STAT class. The next ISP progress report filed in the deprived proceeding on March 3, 2009 made no changes to Mother's ISP domestic violence requirement, reported there had been no such incidences since the adjudication, and simply noted she was "ordered to attend STAT at her court hearing in January" and requested proof by the next hearing. All DHS reports filed thereafter address only her attendance or lack of attendance at the STAT class.[13] More importantly, there is nothing in this proceeding's record, which shows juvenile court approval, express or implied, for DHS's "plugging in" or substitution of the extended domestic violence class for the class she was ordered to complete in her ISP.[14]

■ ¶ 23 To avoid violation of procedural due process, a parent must be given notice of *the conditions* which lead to the child being adjudicated deprived, *Matter of T.M.H.*, 1980 OK 92, ¶ 9, 613 P.2d 468, 471, and of the *standards of conduct* which he or she must satisfy to avoid termination of parental rights so that the parent will have an opportunity to rectify past parental abuse or neglect. *Matter of C.G.*, 1981 OK 131, ¶ 9, 637 P.2d 66, 68–69; *Matter of Baby Girl Williams*, 1979 OK 150, ¶ 17–18, 602 P.2d 1036, 1040; *Matter of*

statements about the four children: "[The foster parents] have had other foster children, but these children are different. [The foster parents] stated they could tell that [the children] have been well taken care of and that they are loved and know how to love." Noted in the April 10, 2008 ISP pre-adjudication report is the comment of the person who made the referral to DHS, "Caller is impressed with the cleanliness and dress of the children."

**13.** In contrast, the progress section of Mother's domestic violence plan requirement in all of the DHS reports from April 2008 through April 2009 repeatedly state "[t]here have been no incidents involving domestic violence since the beginning of this case."

**14.** The trial court in its form Journal Entry filed March 5, 2009, indicated with checkmarks its findings of "continuation of reasonable efforts to reunite the child with the child's family [was] inconsistent with the permanency plan for the child" and "State [would] be filing a termination petition." At the bottom of the order, the trial court wrote "Mother being kicked out of Section 8 housing. State to amend as to Mother." The court's approval of termination at this point is clearly inconsistent with its approval for the DHS "substituted" service which would have taken Mother at least a full year to complete. After State filed its first motion to terminate Mother's parental rights on March 29, 2009, DHS filed a report April 22, 2009, noting Mother "began STAT classes in February and has attended 6 of 6 sessions as of April 9, 2009." There were still no changes made to Mother's ISP domestic violence requirement, and the court's Journal Entry of the same date does not address any change.

*J.F.C.*, 1978 OK 56, ¶ 21, 577 P.2d 1300, 1303. Regarding these standards or "norms of conduct," the Court in C.G. held:

> The very purpose of these norms is to afford the parent an opportunity to ameliorate his condition and to effectively defend against termination efforts. Judicial notice cannot depend on inferences to be gathered from reports of social workers or of medical doctors. It can only be found in written judicially-prescribed norms of conduct to which the parent is expected to conform... Judicial clarity in the prescribed norms of parental conduct is essential to the preservation of the procedural safeguards mandated by state and federal due process.

*Matter of C.G.*, 1981 OK 131, ¶ 9, 637 P.2d at 68–69.

¶ 24 From 1965 to 1981, the trial court's adjudication of a child as "dependent and neglected" provided *notice* to the parent of the *conditions* needing to be corrected *and* the *standards of conduct*.[15] *Matter of Baby Girl Williams*, 1979 OK 150, ¶ 14, 602 P.2d at 1040; *Matter of J.F.C.*, 1978 OK 56, ¶ 21, 577 P.2d 1300, 1303. However, in response to T.M.H. and the last two cited cases,[16] the Legislature enacted 10 O.S. § 1115.1, effective October 1, 1981, requiring DHS to approve and file a "placement plan" with the court "within thirty days after any deprived child had been placed outside of his or her home."

¶ 25 Pursuant to § 1115.1(B), a "placement plan shall contain," in relevant part, the *conditions* the intervention was designed to alleviate, the *methods* used to correct those conditions, *special programs* to be used by the parents to prevent further harm to the child, and the *acts and conduct that would be expected* of the parent or parents before the child should be returned home. Later amendments to § 1115.1 replaced the terms "placement plan" and "special programs"

with "individual service and treatment plan" and "services" and renumbered the statute as 10 O.S. Supp.1995 § 7003–5.3. In 1998, the Legislature enacted additional notice be given to parents by requiring the adjudication order to include a "statement advising the parents that failure *to comply with any requirements of the court* may ultimately result in the loss of custody or the termination of parental rights to the child." (Emphasis added.) 10 O.S. Supp.1998 § 7003–4.5(B).

¶ 26 An ISP prescribed by 10 O.S.2001 § 7003–5.3 (the version in effect when the deprived child proceeding was begun in March 2008) served as "the method used *to advise the parents* of the *standards of conduct* expected of them in order to correct the *condition* leading to the deprived adjudication." (Emphasis added.) *In re S.A.*, 2007 OK CIV APP 97, ¶ 12, 169 P.3d 730, 735. Like prior versions, § 7003–5.3(D)(1) still required an ISP to include a statement of the *conditions* which led to the adjudication with a statement of the *methods* to correct the conditions, and § 7003–5.3(D)(3) required "a description of the *acts and conduct that is expected of the parent or parents* ... that would alleviate the conditions that resulted in the removal of the child before the child can be returned to a safe home." (Emphasis added.) However, changes to § 7003–5.3(D)(2) required an ISP to include "*identification of the services* to be provided to the parent ... to remediate or alleviate the conditions that led to the adjudication, *including services needed to assist the family to provide safe and proper care of the child or to prevent further harm to the child.*" (Emphasis added.) Thus, an ISP may include, and typically does have, two different types of services-those chosen to help the parent to correct the conditions leading to the adjudication ("condition-directed services") and those which help the parent improve his or her care and protection of the child ("general services").

---

15. Standards of conduct, as explained by the Court in *Baby Girl Williams*, 1979 OK 150, ¶ 17, 602 P.2d at 1040, "provide the court, at the termination hearing, with *a criterion* for determining whether the parent has corrected those conditions giving rise to the adjudication order" and "[i]f no standards of conduct are set out at the adjudication stage, the parent is given *no*

*notice* as to what he or she will be called upon to prove to the court in a later termination hearing." (Emphasis added.)

16. *Matter of C.G.*, 1981 OK 131, 637 P.2d 66, *was not decided until November 10, 1981.*

¶ 27 It is clear from § 7003–5.3(D) that the ISP condition-directed services and the "acts and conduct that is expected of the parent or parents," *i.e.*, standards of conduct, have the same goal. Therefore, it stands to reason the Court's requirement for prior notice of and judicial approval and clarity for standards of conduct which are "essential to the preservation of the procedural safeguards mandated by state and federal due process," *Matter of C.G.*, 1981 OK 131, ¶ 9, 637 P.2d 66, 68–69, is just as essential for the condition-directed services in an ISP.

¶ 28 In this case, there is *no* order filed and signed by the trial court that adjudicates the children as deprived,[17] or approves/accepts Mother's stipulation of the petition's allegations,[18] or identifies the conditions to be corrected or standards of conduct, or that gives the required due process or statutory notices. The only record proof of any notice given to Mother is provided by the DHS-prepared ISP, signed by Mother April 21, 2008.[19] On April 22, 2008, the trial court filed a form Journal Entry indicating by checkmarks there had been a "Disposition" hearing at which he had reviewed the "proposed treatment plan" with both parents, who had acknowledged they "understood *the conditions* to be corrected, the *plan requirements*, and that *failure to correct the condi-*

*tions could result in the termination of parental rights.*" (Emphasis added.)

¶ 29 Therefore, unlike the ISP Mother signed and the trial court approved and adopted as its own order, there is nothing in the record after January 9, 2009 to show Mother was given notice or understood that: (1) completion of the STAT class was not just a court order in her criminal misdemeanor case, but also an order of the juvenile court, (2) as such, it was now part of her ISP in the deprived child proceeding, (3) failure to complete the STAT class may be used as evidence that she had failed to correct the condition leading to the deprived status, and as a result, (4) failure to complete the plan not only carried the possibility of incarceration, but also the possibility of termination of parental rights. The latter is particularly critical since failure to complete the plan may be and is often the only evidence State presents to prove the parent has failed to correct the condition which led to the deprived status.

¶ 30 We find prior notice and judicial approval of changes to an ISP is required when, as here, the initial plan is limited, and the proposed substitution involves a condition-directed service or requirement that was never included in the ISP. Without such notice and court approval, we find it was unfair,

---

**17.** A trial court lacks the requisite foundation upon which to terminate parental rights if there is no prior adjudication. *Matter of A.E. v. State*, 1987 OK 76, 743 P.2d 1041. Unlike the State's admission in *A.E.* that there had been no prior adjudication, Mother and State admit in their respective briefs the trial court adjudicated the children deprived on April 10, 2008. Review of the appearance docket revealed three filings on that date, all of which Mother designated for inclusion in the record but only two were included, the "Stipulation" and a form "Journal Entry." The latter is marked as "Pretrial" and none of the possible findings under the "Adjudication" section have any checkmarks. Nor does the handwritten phrase, "Mother & Father are stipulating," comply with § 7003–4.5. Because the designated "OHADJ" was not included and the "Adjudication Orders" filed in 2010 do not satisfy § 7003–4.5, this Court issued an order filed June 13, 2012, requesting a copy from the Oklahoma County District Court Clerk. In a prompt response, the District Court explained "OHADJ" is an accounting docket code recording the statutory court cost for filing the Stipulation on April 10, 2008, and does not reflect a judicial order.

**18.** Following the signatures of both parents, their respective counsel, the children's attorney, and the Assistant District Attorney, the trial judge did not date when these parties had "subscribed and sworn" the Stipulation before him. However, his signature immediately follows his sole order, "This SUMMARY OF FACTS to be placed in the Court file as part of the trial minutes."

**19.** We note Mother's ISP identified "July 18, 2008" as the "ISP Completion Date" and included the following statement mandated by § 7003–5.3(F):

TO THE PARENT: THIS IS A VERY IMPORTANT DOCUMENT. ITS PURPOSE IS TO HELP YOU PROVIDE YOUR CHILD WITH A SAFE HOME WITHIN THE REASONABLE PERIOD SPECIFIED IN THE PLAN. IF YOU ARE UNWILLING OR UNABLE TO PROVIDE YOUR CHILD WITH A SAFE HOME, YOUR PARENTAL AND CUSTODIAL DUTIES AND RIGHTS MAY BE RESTRICTED OR TERMINATED OR YOUR CHILD MAY NOT BE RETURNED TO YOU. (All caps in original.)

prejudicial, and a due process violation to allow State to present evidence of Mother's alleged failure to complete the STAT class in order to prove she failed to correct the "domestic violence/anger management" condition.

¶ 31 Furthermore, by DHS's admitted unilateral substitution of the court-approved, condition-directed service with a service neither approved by the juvenile court nor made a part of Mother's ISP, DHS in reality modified an order, without court approval. State agencies have no authority to modify an ISP, only the trial court has been given authority by the Legislature to modify an existing ISP.[20] By allowing DHS to modify the plan, the trial court has delegated its authority to those without authority to accept it. *Matter of J.M.*, 1993 OK CIV APP 121, ¶ 17, 858 P.2d 118, 123. As the Court in *Matter of J.M.* stated, "[w]e understand that courts learn to trust and depend upon the agencies they use in implementing their orders. The courts may not, however, relinquish their own responsibilities to, and control over, the matters over which they have assumed jurisdiction." *Id.*

¶ 32 Based on all of these reasons, the trial court's termination order is reversed, and the case is remanded for further proceedings. Due to the likelihood of a new trial, we find it necessary to address fundamental errors that occurred at the termination hearing, each of which alone would support reversal of the termination order.

### *"Other Conditions" Mother Allegedly Failed to Correct*

■ ¶ 33 In its Answer brief, State does not dispute the total lack of testimony or evidence of any domestic violence incident or anger management issues involving Mother after the children were removed from her custody. However, as an optional basis for affirming the termination order, State contends there is clear and convincing evidence of *other conditions* in Mother's home which she failed to correct.

■ ¶ 34 It has long been held by Oklahoma courts that "termination [can] be sanctioned only on a finding that [the parent] failed to correct the very condition which lead to the adjudication of [the child]." *Matter of A.D.B.*, 1991 OK 96, ¶ 12, 818 P.2d 483, 488 (relying on *Matter of J.F.C,* 1978 OK 56, 577 P.2d 1300). The State may not terminate the rights of a parent based on *other conditions* that did not serve as a basis for the deprived adjudication or for which no notice was given between the initial adjudication and the termination stage. *Matter of J.N.M.*, 1982 OK 153, ¶ 16–17, 655 P.2d 1032, 1037.

¶ 35 State argues Mother had not corrected "conditions in the home" to which it claims she had *stipulated, i.e.,* anger management, domestic violence, inadequate home due to lack of utilities, inappropriate disciple, and lack of proper parental care and guardianship. Because of the constitutionally protected interests in these proceedings, we will not presume Mother stipulated to all of the adjudication petition's allegation, when the record clearly shows otherwise. After State filed the petition to adjudicate the four children as deprived, DHS filed a report stating all of the allegations "had been corrected" *except for* domestic violence.[21] This report confirms the caseworker's testimony why Mother's ISP was limited to the "domestic violence/anger management" condition.

---

20. Pursuant to 10 O.S.2001 § 7003–5.3(C)(4), an ISP shall, *inter alia*, be "[s]ubject to modification *based on changing circumstances consistent with the correction of the conditions that led to the adjudication of the child.*" (Emphasis added.) A separate statute, 10 O.S. Supp.2007 § 7003–5.6, provides for modifications at periodic review hearings at which the court shall "[o]rder such modification to the existing individual treatment and service plan *as the court determines to be in the best interests of the child and necessary for the correction of the conditions that led to the adjudication of the child.*" § 7003–5.6(F)(6).

21. According to the April 9, 2008 Team Decision Making, the allegations of "Inadequate or Dangerous Shelter conditions *have been corrected,*" *i.e.,* observations at unannounced visit showed home had running water, was clean and free of any safety hazards, and designated "services recommended." In contrast, the allegations of "Exposure to Domestic Violence were confirmed and Court Intervention was requested."

¶ 36 Further, the two-page form Stipulation filed April 10, 2008, does not mention the specific allegations of the petition or the "amended petition," also referred to in the Stipulation.[22] Nor is there any specification of the "conditions which cause the child(ren) to be deprived." Finally, there is no filed adjudication order which either identifies the specific allegations of the petition to which Mother stipulated or makes a finding of the specific conditions which lead the deprived adjudication.

¶ 37 Even if an adjudication order had been filed finding Mother stipulated to every allegation in the petition to adjudicate, the ISP would nevertheless control as a subsequent order of the trial court which by statute now mandates the notices a parent must receive. As we construe the ISP in this case, the "[c]onditions that need to be corrected" section and the standards of conduct and services listed in the ISP "Desired results" and "To-do's" sections, clearly identify domestic violence as the condition which caused the children's removal from Mother's home. Although the ISP does not specifically refer to either "anger management" or "inappropriate discipline," the goal of the standards of conduct and the two condition-directed services prescribed for Mother clearly identified correction of both conditions.[23] Because Mother's ISP addresses only these conditions, termination of her parental rights based on failure to correct the other conditions to which State claims she stipulated would violate Mother's right to due process.

¶ 38 We reach the same conclusion regarding State's argument Mother had not corrected "conditions in the home" about which she testified at trial, i.e., "instability as it related to her housing, employment and finances." Again, the ISP did not identify either of the aforementioned deficiencies as a condition to be corrected, a desired result, or a service/requirement.

¶ 39 Our interpretation is confirmed by the caseworker's testimony, who was asked, "What was it that [Mother] was needing to do in order to correct conditions in her home?" She responded, *"Originally,* we asked [Mother] to go to parenting classes and to engage in domestic violence service." (Emphasis added.) When asked what she meant by "originally," the caseworker responded, as follows:

> Well, *since that time,* there have been *other things* that have made [DHS] feel like that they could not put the children back in the home when maybe in—in most other instances we would have. And that was just that she—while [Mother] went through her parenting class and completed those fairly quickly, there were some issues with the domestic violence classes and getting those started and *then we dropped it and went with the STAT classes.*

> But we found then that there was *not financial stability* for [Mother] and that there was *not enough income in the home* even with food stamps, Section 8 housing and that kind of thing. There were concerns that there was *not enough money in the home* for her to be able to provide for the children. (Emphasis added.)

Agreeing with counsel that a parent's correction of conditions in their home "is not as simple as checking the boxes off on the ISP," the caseworker explained:

> And that's the case in this situation, that even though she completed some of those things that—the treatment plan was the original reason the children were brought into case, but *since that time* there have been *other issues* that have kept us from

<hr>

22. The certified court appearance document does not list the filing of an amended adjudication petition. However, the answer "yes" was printed in response to question # 20 of the Stipulation, "Do you admit (stipulate) the allegations in the [*amended*] petition are true?" The parentheses in the question was typed in the form Stipulation, whereas the brackets are added to explain the word "amended" was handwritten above a caret between the words "the" and "petition."

23. The "Desired results" section requires Mother to demonstrate "safe interactions with her children" and "calm communication and problem solving is proper way to deal with disagreements," and to "complete parenting classes, to appropriately discipline [her] children." The parenting class was listed as a "To do" for Mother, under which she was instructed "follow all recommendations of the service provider that adddresses (sic) improving her parenting skills and her interactions with her children."

being able to put the children back in home—back in the home.

You know, for a long time, it was a *lack of a home* or, you know, she had *trouble keeping utilities on.* We tried to help her with that as much as we could, but the State has limited resources and ability to, you know, just pay utility bills month after month. And so it became a concern, a *problem, for her to be able to do that on her own and to maintain employment and be able to care for those services herself.* (Emphasis added.)

¶ 40 These "other conditions" became the primary focus of DHS several months before its unilateral substitution of the STAT class.[24] Thereafter, the focus of DHS was Mother's failure to complete the latter class *and* these "other conditions."[25] State's parental right termination case against Mother was also based on her "failure to complete" the STAT class and on her alleged inability to make enough money, maintain a home with working utilities, and stay current on child support.[26] These alleged deficiencies were not addressed in Mother's ISP, either as conditions to be corrected, standards of conduct, as services and/or requirements, *or* as an ISP obligation. Termination of parental rights in the absence of adequate notice

violated Mother's due process rights. The record demonstrates Mother did not receive the requisite notice of these "other conditions" on which State sought to prove at trial that she failed to correct.[27]

¶ 41 Although raised at trial but not on appeal, we conclude Mother's failure to complete the domestic violence class at the YWCA may not serve as a basis for termination since it is undisputed in this record that service provider's initial intake assessment of Mother, *i.e.,* she did not need services, caused significant confusion and resulted in reassessment and delay in Mother starting the class until December 2008.[28] By February 2009, she had begun the STAT class which DHS accepted in lieu thereof without approval of the juvenile court and proper notice to Mother. Termination of parental rights is never justified when a parent's failure to complete the plan that was designed to correct the very condition which lead to the adjudication is contributed to by the agent(s) to whom is entrusted the duty to help salvage the family relationship. *Matter of Christopher H.,* 1978 OK 50, ¶ 18, 577 P.2d 1292, 1295; *Matter of J.M.,* 1993 OK CIV APP 121, ¶ 5, 858 P.2d 118, 121.

**24.** In the ISP progress report filed August 20, 2008, DHS recommended unsupervised day visitations with Mother *but only if* her water and electricity are turned on and working properly. On this point, the report notes a "major barrier in reunification of these children with [Mother] is her *lack of income* which leads to her inability to pay bills and maintain a stable home for her children," she "was unemployed four months prior to the children's removal and has been *unable to maintain employment since the beginning of the case,*" and "worker continues to encourage [Mother] to seek employment that is near her home *so transportation will not prevent her from maintaining a job.*" Nothing in the record indicates Mother's inability to maintain employment was caused from her unwillingness to work, behavioral issues or things within her control. The caseworker testified at trial due to limited resources no bus vouchers were available for Mother.

**25.** In its July 2009 report after the termination petition was filed in March, 2009, DHS's termination recommendation was "based on the length of time and failure to correct the conditions which brought the children into DHS custody," explaining "[it] has been waiting for

[Mother] to obtain a home with working utilities, however, she has been unable to complete this basic request."

**26.** State questioned Mother about her failure to be current on child support payments and admitted into evidence the child support order, all without objection by Mother's counsel. This obligation was never included in Mother's ISP. Even more concerning from the caseworker's testimony and the record is that DHS and the trial court never considered the connection of Mother's $350.00 child support obligation and her inability to provide "such basic requests," despite Mother's numerous pleas to the caseworker about this problem, beginning in mid-2009.

**27.** To clarify our holding, the "other conditions" evidence is only admissible to establish the § 7006–1.1(A)(5) element that "termination is in the best interest of the children."

**28.** We note for the record DHS's reports are inconsistent on whether Mother ever started the domestic violence class at the YWCA after her reassessment, but her trial testimony that she did start is uncontroverted.

*Defective Jury Instructions, Verdict and Termination Order*

¶ 42 In Mother's insufficiency of the evidence argument, she claims State failed to prove the elements of the applicable statute, "10 O.S. § 7006–1.1(A)(5)." [29] State acknowledges in its Answer Brief that it moved to terminate Mother's parental rights in March of 2009 based on § 7006–1.1(A)(5), but one year later amended its petition "in order to comply with revision of the applicable statute," 10A O.S. Supp.2009 § 1–4–904(B)(5). Based on the amended version, State asks us to affirm the jury verdict terminating Mother's parental rights to her four children.

¶ 43 Review of the record, however, reveals the jury was given an instruction listing the elements of § 7006–1.1(A)(5), instead of § 1–4–904(B)(5), which went into effect May 21, 2009.[30] The record also reveals Mother never objected to State's amended petition, and neither party objected to the jury instructions given by the trial court at the April 6–7, 2011 termination hearing.

¶ 44 It is the trial court's affirmative duty "to give instructions which accurately reflect the law regarding the issues presented." *Sullivan v. Forty–Second West Corp.*, 1998 OK 48, ¶ 12, 961 P.2d 801, 802–

803. When a jury instruction does not accurately state the law, a party is required to make an objection complying with 12 O.S. 2001 § 578, in order to preserve that issue for appellate review. Nevertheless, appellate courts may review a jury instruction that the party neither properly preserved below nor addressed on appeal for fundamental errors of law. *Sullivan v. Forty–Second West Corp.*, 1998 OK 48, ¶¶ 3–4, 961 P.2d 801, 802–803. Fundamental error "compromises the integrity of the proceeding to such a degree that the [jury instruction] has a substantial effect on the rights of one or more of the parties," (emphasis added), *id.*, ¶ 7, and "may occur when the trial court does not accurately instruct the jury on the law." *Taliaferro v. Shahsavari*, 2006 OK 96, ¶ 25, 154 P.3d 1240, 1247–1248.

¶ 45 Division I of the Court of Civil Appeal recently reviewed for fundamental error the identical issue with a jury instruction in a parental rights termination proceeding which was based, in part,[31] on the parents' failure to correct the conditions which led to the deprived adjudication. *In re L.M.*, 2012 OK CIV APP 41, 276 P.3d 1088. Similar to this case, the deprived adjudication in *L.M.* had occurred *prior to* the Legislature's amendments and renumbering of the Oklahoma

**29.** Prior to May 21, 2009, § 7006–1.1(A)(5) authorized a trial court to terminate parental rights on "finding that: (a) the child has been adjudicated to be deprived, *and* (b) such condition is caused by or contributed to by acts or omissions of the parent, *and* (c) termination of parental rights is in the best interests of the child, *and* (d) the parent has failed to show that the condition which led to the adjudication of a child deprived has been corrected although the parent has been given not less than three months." (Emphasis added.)

**30.** The court's unnumbered instruction cites to "OUJI–JUV. NO. 3.4," one of several "Oklahoma Uniform Jury Instructions for Juvenile Cases" approved by the Supreme Court in 2005. OUJI–Juv No. 3.4 lists the elements of § 7006–1.1(A)(5), "Failure to Correct Conditions." *See In re Oklahoma Uniform Jury Instructions for Juvenile Cases*, 2005 OK 12, 116 P.3d 119, 145. When adopting the instructions for juvenile cases, the Supreme Court expressly ordered "all trial courts in Oklahoma" to use the uniform instructions "*if* the court determines that the subject of the instructions would be appropriate in the particular matter on trial *and unless the trial court determines that such recommended in-*

*struction does not accurately state the law.*" (Emphasis added.) *Id.*, 2005 OK 12, ¶ 2, 116 P.3d at 119. The record does not include any proposed or recommended jury instructions from Mother or State, and the certified appearance docket included in the record does not show any such filing.

New jury instructions for § 1–4–904 were approved by the OUJI–Juvenile committee March 19, 2010, with final modification January 21, 2011, and approved by the Supreme Court April 18, 2011. *See In re L.M.*, 2012 OK CIV APP 41, n. 11, 276 P.3d 1088, 1099. The jury trial in this case was held April 6–7, 2011, a week before approval of the new OUJI–juvenile, so the available jury instructions were still based on § 7006–1.1(A) grounds. Because the trial transcript reveals no on-the-record discussion concerning trial court's use of OUJI–Juv. 3.4, we presume the trial court considered the amended version but determined § 7006–1.1(A)(5) accurately stated the law applicable to the termination proceeding against Mother.

**31.** The State in *L.M.* had also moved to terminate the mother's parental rights based on mental illness.

Children's Code from Title 10 to Title 10A, the State had moved to terminate parental rights after the effective date of Title 10A (May 21, 2009) based on the amended "failure to correct" ground, § 1–4–904(B)(5), and during the parents' trial, the trial court instructed the jury on the former version, § 7006–1.1(A)(5). As in this case, the issue of which statutory version governed the proceeding was not raised on appeal.

¶ 46 When deciding that issue, the Court of Appeals in *L.M.* found there was no express provision for retroactive application of § 1–4–904(B)(5), which the Legislature had amended by deleting one of § 7006–1.1(A)(5)'s elements during the *pending* deprived proceeding. The Court then held § 1–4–904(B)(5)'s application would have affected the parties' substantive rights by lessening the State's evidentiary burden to terminate the rights of each parent and increasing the parents' burden to defend against termination. Finally, the Court in *L.M.* found (1) the filing of a petition to adjudicate a child as deprived is the initial and critical step within the meaning of "proceedings begun" under Article 5, § 54 of the Oklahoma Constitution, (2) the latter constitutional provision protects the elements of § 7006–1.1(A)(5) from legislative extinguishment, and therefore, (3) under the specific facts of that case, the elements of the amended version, § 1–4–904(B)(5), must be applied prospectively only. Consequently, the Court in *L.M.* held the trial court's jury instruction based on § 7006–1.1(A)(5) did not constitute fundamental error.

¶ 47 The Court's analysis in *L.M.* applies equally to this case. Based on its findings and authorities, we conclude § 1–4–904(B)(5) may not be applied retroactively to the facts of this case and that § 7006–1.1(A)(5), the statutory version *in effect* when the deprived child proceeding was begun in March of 2008, governs the proceeding to terminate Mother's parental rights. As a result, we find no fundamental error with the giving of a jury instruction based on the elements of § 7006–1.1(A)(5).

¶ 48 However, the same cannot be said with respect to the remaining jury instructions, verdict, and termination order. All fail to specify the *conditions* which Mother allegedly failed to correct, as required when termination of parental rights is sought for failure to correct the conditions pursuant to 10A O.S. § 1–4–904(B)(5) or 10 O.S.2001 § 7006–1.1(A)(5). *See Matter of R.A., W.A., Z.A. and A.A.,* 2012 OK CIV APP 65, 280 P.3d 366 (mandate issued June 28, 2012).

¶ 49 Like in *Matter of R.A., W.A., Z.A. and A.A.,* each of the four jury verdicts in this case contain no identification of the uncorrected conditions or any of the other required § 7006–1.1(A)(5) findings, *i.e.,* Mother was given at least three months to correct the condition and most importantly, that termination is in the children's best interests. This latter finding is also missing from the termination order.[32]

¶ 50 Particularly in light of the evidence of the "other conditions" presented to the jury, the deficiencies in the jury instructions and verdict forms make it impossible to determine whether the jury made the necessary findings to support termination of Mother's parental rights. Therefore, we find fundamental error in the trial court's jury instructions, verdict forms, and the termination order.

### CONCLUSION

¶ 51 The order terminating Mother's parental rights is **REVERSED** for denial of procedural due process. The case is **REMANDED** to the district court for further proceedings consistent with this opinion, which does not affect the existing court-approved DHS foster care placement of these four children.

¶ 52 **REVERSED AND REMANDED.**

BELL, P.J., and MITCHELL, J., concur.

---

**32.** Unlike in *Matter of R.A., W.A., Z.A. and A.A.,* the trial court's order found the requirements of the amended termination ground, § 1–4–904(B)(5), were "proven by clear and convincing evidence." However, as discussed in this opinion, the elements of the former ground, § 7006–1.1(A)(5), were instead given to the jury, and after review for fundamental error, this Court found no such error because the former version governs this proceeding.